**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| ANTHONY CHAVEZ, <br><br> Plaintiff, <br><br> - against - <br><br> CENTURION, LLC; CENTURION DETENTION HEALTH SERVICES, LLC; MHM HEALTH PROFESSIONALS, INC.; BERNALILLO COUNTY BOARD OF COUNTY COMMISSIONERS; STEVEN WHEELER, in his individual capacity; ROCK WELCH, in his individual capacity; JEFFREY KELLER, in his individual capacity; ANGELA GOEHRING, in her individual capacity; KAREN RILEY, in her individual capacity; and JOHNNIE LAMBERT, in her individual capacity, <br><br> Defendants. | No. _____ <br><br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Anthony Chavez ("Plaintiff" or "Mr. Chavez"), by his attorneys, Collins & Collins, P.C., Guebert Gentile Piazza & Junker, P.C., and Prison Lights, Inc., and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202, brings this action (the "Complaint") to redress violations of Mr. Martinez's Eighth and Fourteenth Amendment rights under the United States Constitution, and alleges, based on personal knowledge as to his own experiences and otherwise on information and belief, as follows:

**PRELIMINARY STATEMENT**

1.    The Bernalillo County Board of County Commissioners ("Bernalillo County"), Centurion, LLC; Centurion Detention Health Services, LLC (together, "Centurion"), and MHM Health Professionals, Inc. ("MHM"), acting through their respective employees, staff, agents and assigns, knew that Mr. Chavez was at a high risk of developing osteomyelitis and that he was

1

suffering from increasing and debilitating pain that was not ameliorated over time or through pain medication. Yet, Defendants deliberately and recklessly ignored an emergent infection and Mr. Chavez's high risk of osteomyelitis, which caused him to suffer extended and unnecessary severe pain and substantially delayed his diagnosis of osteomyelitis and subsequent treatment.

2.      Mr. Chavez's injuries and resulting severe pain and debilitation were, in part, the result of Centurion's widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care.

3.      The actions and inactions of Defendants violated Mr. Chavez's rights secured by 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

4.      This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

5.      Subject matter jurisdiction in conferred by 28 U.S.C. §§ 1331 and 1343(a).

6.      This Court has personal jurisdiction over each of the entity and individual Defendants because, upon information and belief, all Defendants are domiciled in the State of New Mexico (the "State") and/or have substantial contacts in the State of New Mexico and purposefully availed themselves of conducting business in New Mexico.

7.      Venue is proper here under 28 U.S.C. § 1391(b)(2), because, upon information and belief, a majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## PARTIES

8.      Plaintiff Anthony Chavez is presently domiciled in New Mexico. During the events

giving rise to this action, Mr. Chavez was physically located in Albuquerque, New Mexico. During all relevant times, he was in the custody of the Bernalillo County and Centurion, housed in the Bernalillo County Metropolitan Detention Center ("MDC") in Albuquerque, New Mexico. During these times, both Bernalillo County and Centurion had a duty to provide him with medical care and treatment consistent with applicable and prevailing standards of medical care.

9.      Defendant Centurion Detention Health Services, LLC is a foreign limited liability company registered to do business in New Mexico, whose registered agent for service of process is CT Corporation System, 206 S. Coronado Avenue, Española, New Mexico, 87532-2792. At all times relevant to this lawsuit, Centurion was contracted by Bernalillo County for the purposes of providing medical care to prisoners housed at MDC, including Mr. Chavez. Through this contract, Centurion was acting as the apparent and actual agent, servant, and contractor of Bernalillo County and was responsible for the care, health, safety, and proper medical treatment of all detainees at MDC, including Mr. Chavez. Under this contract, Bernalillo County adopted Centurion's policies, practices, habits, customs, procedures, training, and supervision as its own, and Centurion adopted Bernalillo County's policies, practices, habits, customs, procedures, training, and supervision as its own. Centurion acted by and through its employees, staff, agents and assigns, including the Centurion medical staff involved in the events giving rise to this lawsuit as described in further detail below.

10.     Upon information and belief, Defendant Centurion, LLC is the parent company of Centurion Detention Health Services, LLC. Through the parent-subsidiary relationship between Centurion, LLC and Centurion Detention Health Services, LLC, Centurion, LLC was acting as the apparent and actual agent, servant, and contractor of Bernalillo County and was responsible for

3

the care, health, safety, and proper medical treatment of all detainees at MDC, including Mr. Chavez at all times relevant to this lawsuit. In accordance with the close oversight that Centurion, LLC provided as the parent of its subsidiary Centurion Detention Health Services, LLC at all times relevant to this lawsuit: Centurion, LLC adopted Centurion Detention Health Services, LLC's and Bernalillo County's policies, practices, habits, customs, procedures, training, and supervision as its own, and Bernalillo County and Centurion Detention Health Services, LLC adopted Centurion LLC's policies, practices, habits, customs, procedures, training and supervision as their own. Centurion, LLC acted by and through its employees, staff, agents and assigns, including the Centurion medical staff involved in the events giving rise to this lawsuit as described in further detail below.

11.    Because each action of Centurion Detention Health Services, LLC can also be attributed to Centurion, LLC, both entities will be collectively referenced as "Centurion."

12.    Defendant MHM is a Delaware for-profit corporation that contracted to supply medical personnel to Centurion for purposes of providing medical services to MDC prisoners, including Mr. Chavez. Through an addendum to the contract between Bernalillo County and Centurion, MHM became a subcontractor operating under the contract between Centurion and Bernalillo County. Accordingly, MHM was acting as the apparent and actual agent, servant, and contractor of Bernalillo County and was responsible for the care, health, safety, and proper medical treatment of all detainees at MDC, including Mr. Chavez. Pursuant to MHM's contract with Centurion as a subcontractor under Centurion's contract with Bernalillo County, MHM adopted Centurion's and Bernalillo County's policies, practices, habits, customs, procedures, training, and supervision as its own, and Bernalillo County and Centurion adopted MHM's policies, practices,

4

habits, customs, procedures, training and supervision as their own. MHM acted by and through its employees, staff, agents and assigns, including the Centurion medical staff involved in the events giving rise to this lawsuit as described in further detail below.

13. Upon information and belief, Defendant Steven Wheeler served as Centurion, LLC's CEO at all times relevant to this lawsuit. He was responsible for reviewing and approving all contracts between Centurion and Bernalillo County. He also acted as a supervisor to the Centurion medical staff described below and exerted direct authority over them and their decisions. He was an agent of Centurion, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

14. Upon information and belief, Defendant Rock Welch served as Centurion, LLC's Senior Vice President of Operations at all times relevant to this lawsuit. He also acted as a supervisor to the Centurion medical staff described below and exerted direct authority over them and their decisions. He was an agent of Centurion, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

15. Upon information and belief, Defendant Jeffrey Keller served as Centurion, LLC's Chief Medical Officer at all times relevant to this lawsuit. Defendant Keller was responsible for instituting and overseeing facility-related procedures and protocols, including those of Centurion medical staff at MDC. He also acted as a supervisor to the Centurion medical staff described below and exerted direct authority over them and their decisions. He was an agent of Centurion, acting within the scope of his employment at all times relevant to this lawsuit. He is sued herein in his individual capacity.

16. Upon information and belief, Defendant Angela Goehring served as Centurion,

LLC's Chief Nursing Officer at all times relevant to this lawsuit. Defendant Goehring was responsible for overseeing the clinical development, processes, and procedures of Centurion medical staff at MDC. She also acted as a supervisor to the Centurion medical staff described below and exerted direct authority over them and their decisions. She was an agent of Centurion, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

17.     Upon information and belief, Defendant Karen Riley served as Centurion, LLC's Corporate Continuous Quality Improvement ("CQI") Director at all times relevant to this lawsuit. Defendant Riley was responsible for implementing CQI programs for Centurion contracts, providing CQI regional and corporate level training, contract auditing, process assessments, and taking any necessary corrective action. She also acted as a supervisor to the Centurion medical staff described below and exerted direct authority over them and their decisions. She was an agent of Centurion, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

18.     Upon information and belief, Defendant Johnnie Lambert served as Centurion, LLC's Clinical Operations Specialist at all times relevant to this lawsuit. Defendant Lambert was responsible for developing policy and procedure of Centurion medical staff at MDC as well as related auditing and grievances processes. She also acted as a supervisor to the Centurion medical staff described below and exerted direct authority over them and their decisions. She was an agent of Centurion, acting within the scope of her employment at all times relevant to this lawsuit. She is sued herein in her individual capacity.

19.     At all times relevant to this Complaint, each of the abovenamed Defendants was an

employee and/or agent of Bernalillo County-run entity or a private medical service responsible for treating state prisoners, a task which was ultimately the responsibility of the State of New Mexico. Accordingly, all Defendants were acting under color of state law at all relevant times.

## FACTUAL BACKGROUND

I.    **MR. CHAVEZ DISPLAYED AND COMPLAINED OF SEVERE PAIN AND A BACK WOUND INFECTION FOR OVER A YEAR, AND DEFENDANTS REPEATEDLY REFUSED TO TREAT OR DIAGNOSE HIM, THEREBY CAUSING OSTEOMYELITIS AND HIS INABILITY TO WALK.**

20.    At the time that Mr. Chavez's back infection became most concerning, he was 28 years old and in jail in the custody of Bernalillo County at Bernalillo County Metropolitan Detention Center in Albuquerque, New Mexico.

21.    On December 21, 2019, Mr. Chavez submitted a health services request form, complaining to Centurion medical staff of severe pain rated 9 of 10 in severity and profuse drainage from his back wounds.  Mr. Chavez also complained of severe back pain rated 10 of 10 in severity and limited range of motion. Despite these clear signs of serious medical issues and infection, Centurion medical staff merely prescribed him Ibuprofen and returned him to his cell.

22.    On December 23, 2019, Mr. Chavez was evaluated again by Centurion medical staff, who noted that his back wound was leaking a substantial amount of fluid. However, Centurion medical staff provided no treatment in the face of these alarming signs of infection.

23.    On December 24, 2019, Centurion medical staff again noted that fluids were leaking from Mr. Chavez's back wound but provided no treatment or referral to a medical provider who could provide proper treatment.

24.    On December 27, 2019, Centurion medical staff again noted that a serious amount of fluid was leaking from Mr. Chavez's back wound, but they continued to fail to provide treatment

7

and refused to refer Mr. Chavez to a medical provider who could provide proper treatment.

25.    On December 30 and 31, 2019, Centurion medical staff persistently noted that Mr. Chavez's back wound was red and leaking fluids through multiple open regions. Yet, Centurion medical staff merely cleansed the wound and told him to drink more water before sending him back to his jail cell.

26.    On January 1, 2020, Mr. Chavez continuously and emphatically expressed severe 10 out of 10 pain in his lower back region related to the infected incision sites. In response, Centurion medical staff merely changed the dressings on his wounds and provided no treatment or referral to a medical provider capable of providing him with proper medical care.

27.    On January 4, 2020, Mr. Chavez complained to Centurion medical staff of severe pain due to his infection, but he was merely given Tylenol and sent back to his jail cell.

28.    On January 7, 2020, Centurion medical staff noted that puss was amassing on Mr. Chavez's back wound, and there were still holes at the wound site. Still, Centurion medical staff permitted Mr. Chavez's severe infection to go untreated. Mr. Chavez was discharged from jail

29.    The next day, on January 8, 2020, Mr. Chavez visited the emergency room of the University of New Mexico Hospital ("UNMH") for help treating his escalating infection, which was causing severe back pain, fever, and chills. Hospital staff noted that Mr. Chavez did not receive appropriate care for his recovery from Centurion medical staff. Centurion medical staff failed to provide Mr. Chavez with the necessary antibiotics for his recovery from at least December 17, 2020 to January 9, 2020, when he was hospitalized due to his neglected infection.

30.    Additionally, hospital staff noted that Mr. Chavez was discharged from jail without his necessary medications on January 7, 2020. Hospital staff also noted that Mr. Chavez's back

8

wound was not healing well and that the drainage from his back required further medical intervention.

31.     Accordingly, hospital staff drained Mr. Chavez's back wound and properly dressed it. They also provided him with the necessary antibiotics that Centurion medical staff had continually refused to provide.

32.     On February 5, 2020, Mr. Chavez was again in custody at the Bernalillo County Metropolitan Detention Center. At this time, he submitted a health services request form asking for medical care for his back wound. Mr. Chavez was not seen by Centurion medical staff until February 16, 2020, and he was forced to endure substantial pain during this waiting period.

33.     On February 16, 2020, medical staff denied him any extra mattress to help alleviate his back pain, and they also denied his request for a Meloxicam prescription—an anti-inflammatory drug that reduces pain, swelling, and stiffness. Rather than provide any treatment for Mr. Chavez's back injury, Centurion medical staff merely told him to control his own pain through controlled breathing and visualization techniques. Centurion allowed Mr. Chavez's severe pain to go unaddressed by refusing to provide him with any care.

34.     On February 28, 2020, certain Centurion medical staff members noted that an MRI should be done of Mr. Chavez's lumbar spine. However, Centurion medical supervisory staff denied requests for an MRI and continued providing Mr. Chavez with no care for his injury.

35.     On March 5, 2020, Mr. Chavez submitted a health services request form to Centurion medical staff requesting care for his severe back pain and swelling. He emphasized that he needed immediate help. Centurion medical staff ignored this request and refused to even see him.

36.    On March 13, 2020, Mr. Chavez submitted another health services request form to Centurion medical staff requesting care for his severe back and hip pain. In the form, he noted that the pain was so severe that he had difficulty sleeping. Again, Centurion medical staff ignored his severe pain and growing infection and refused to even see him or take any action.

37.    Yet again, on March 20, 2020, Mr. Chavez submitted a health services request form to Centurion medical staff, again noting his severe back pain that had gone untreated for weeks. Later that day, Centurion medical staff finally saw Mr. Chavez for his back pain. He was brought to the medical unit in a wheelchair due to his inability to walk.

38.    Centurion medical staff noted that Mr. Chavez would frequently moan and cry out when trying to sit or stand up from a sitting position. Centurion medical staff noted that they visually observed his difficulty ambulating and that he required a cane to walk. In response, Centurion medical staff merely provided him with a Meloxicam prescription. They did not attempt to provide him with actual treatment, such as antibiotics, and they did not send him to an outside medical provider who could properly care for his wounds.

39.    On March 24, 2020, Mr. Chavez was again seen by Centurion medical staff, who noted that he was concerned that his back wound had gotten an infection. Mr. Chavez noted his increased pain and fever. He requested an increase in his pain medication, which Centurion medical staff provided. However, Centurion medical staff did nothing to address his back infection. They merely provided him with pain medication in lieu of any treatment.

40.    Upon information and belief, although an X-ray and MRI were recommended by certain Centurion medical staff, supervisory staff with Centurion failed to provide any diagnostic care or treatment to Mr. Chavez from March 24, 2020 to May 7, 2020, during which time his pain

and infection were exacerbated due to the lack of any medical treatment by Centurion.

41.    On May 8, 2020, shortly after Mr. Chavez had been released from jail, he again went to UNMH to receive medical care for his back wound, which had been neglected by Centurion medical staff.

42.    On April 14, 2021, Mr. Chavez was again in custody at the Bernalillo County Metropolitan Detention Center. At the time, he submitted a health services request form to Centurion medical staff asking that his back injury be addressed. He noted that it felt like a screw from a metal rod in his back had become dislodged inside his body, and he could feel the grooves on the screw starting to push through his skin. He noted that it caused him severe pain, and he also noted concerns of an infection.

43.    On April 15, 2021, Mr. Chavez was seen by Centurion medical staff, who noted that his pain was eight out of ten in severity. Centurion medical staff also noted that Mr. Chavez's back was tender and swelling and that he had bone or joint deformity. Despite Mr. Chavez's severe pain and the fact that Centurion medical staff had diagnosed him with sprains and minor trauma, Centurion medical staff merely prescribed him with Ibuprofen. They failed to treat his injuries.

44.    On May 1, 2021, Mr. Chavez was again seen by Centurion medical staff because he was unable to walk due to his extreme back pain. However, after noting Mr. Chavez's alarming state, Centurion medical staff merely prescribed him with a D- Cerin cream, an over-the-counter moisturizer.

45.    Mr. Chavez's pain and infection were allowed to fester until he needed to be transferred to UNMH urgent care on May 4, 2021. Hospital staff noted that Mr. Chavez had been suffering from untreated and undiagnosed osteomyelitis (bone infection and inflammation) with a

possible intradisc abscess (a collection of pus or infected fluid surrounded by inflamed tissue) and epidural phlegmon (inflamed spinal tissue usually caused by infection).

46.     Centurion medical staff refused to properly evaluate, treat, or refer Mr. Chavez for outside medical care until his pain and infection became so severe that he could no longer walk and he was forced to endure a series of preventable emergency medical situations. Centurion's medical neglect caused Mr. Chavez an immense and unnecessary amount of pain, extended over months and years. Centurion's medical neglect also caused delayed diagnoses of infection, abscesses, regional cellulitis (deep skin infection), myositis (muscle inflammation, pain, and weakening), osteomyelitis, and discitis (serious infection of intervertebral disc space in spine).

**II.    DEFENDANTS DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF FAILING TO MEET THE STANDARDS OF CARE IN TREATING PATIENTS IN THE MEDICAL UNIT, EFFECTIVELY DENYING THEM MEDICAL CARE, AND THIS PRACTICE CAUSED MR. CHAVEZ'S INJURIES.**

47.     Centurion maintained various widespread patterns and practices which violated Mr. Chavez's constitutional rights and contributed to his medical complications and severe pain, including: (1) failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions; (2) delaying or denying patient referrals to necessary emergency or other offsite medical services; (3) severely understaffing its medical and mental health facilities; (4) failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff; and (5) failing adequately to train and supervise its employees and agents on procedures necessary to protect patients' health.

48.     In essence, Centurion's medical care of prisoners effectively amounted to no

medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade . . . [and] so cursory as to amount to no treatment at all") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by . . . proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.").

49.    For years, MHM has screened and supplied Centurion with its medical personnel, including supervisory personnel—and these medical personnel perpetuated the below unconstitutional patterns and practices. Just like Centurion, MHM has been on notice that its patterns and practices of inadequate screening and supplying of medical personnel has resulted in persistent constitutional violations against the prison populations that it serves. Accordingly, MHM has caused and exhibited the same below-stated unconstitutional patterns and practices as Centurion, which contributed to Mr. Chavez's injuries here.

50.    Likewise, for years, Bernalillo County has contracted with Centurion to provide constitutionally deficient medical care to the prisoners in its care—all while knowing that Centurion provides constitutionally inadequate medical care that causes unnecessary pain, suffering, and commonly, death. Accordingly, Bernalillo County has caused and exhibited the same below-stated unconstitutional patterns and practices as Centurion, which contributed to Mr. Chavez's injuries here.

A.    <u>Centurion had a pattern and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions, and of delaying or denying patients access to critical off-site medical services, which were contributing factors to Mr. Chavez's injuries.</u>

51.    Centurion failed to report, diagnose, and treat the warning signs of serious conditions for many other patients in circumstances similar to those of Mr. Chavez. For example:

- In *Jerry Sisneros v. Centurion et al.*, No. D-101-CV-2019-00598 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of diskitis and osteomyelitis, which resulted in the patient's needlessly extended suffering and over a month of avoidable off-site care.

- In *Gerald Wilson v. Centurion et al.*, No. D-101-CV-2019-00691 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of discitis and osteomyelitis, which resulted in the patient developing severe sepsis and lifelong spinal disabilities, and being hospitalized for 35 days.

- In *George Yribe v. Centurion et al.*, No. D-101-CV-2019-00633 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of diskitis and osteomyelitis, which resulted in the patient developing serious and permanent injury.

- In *George Parra v. Centurion et al.*, No. D-101-CV-2018-01188 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of advanced muscular dystrophy and severe spinal infection, which resulted in the patient being sent to the emergency room.

- In *Dominick Mora-Solis v. Centurion et al.*, No. D-101-CV-2019-00627 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of a severe pressure ulcer, sepsis, and acute chronic osteomyelitis, which resulted in permanent injuries to the patient.

- In *Jade Hetes v. Centurion et al.*, No. D-101-CV-2019-00113 (N.M. 1st Dist. Ct), Centurion failed to timely report, diagnose, and treat signs of severe mental illness, which resulted in the patient's death from suicide.

- In *Manuela Vigil v. Centurion et al.*, No. D-101-CV-2018-00033 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat signs of abscesses, which resulted in the patient's death.

- In *Michael Wilder v. Centurion et al.*, No. D-101-2018-00608 (N.M. 1st Dist. Ct.), Centurion failed to timely report, diagnose, and treat sign of a broken collarbone, which resulted in the patient suffering lengthy, extended pain.

52.    The preceding cases and others illustrate Centurion's persistent refusal to refer inmate patients out to third-party medical providers for the provision of care unavailable through

14

Centurion within prison facilities.

53. Upon information and belief, Centurion's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated, as Centurion was contractually obligated to pay $0.00 for any hospitalization lasting 24 hours or more.

54. Upon information and belief, Centurion paid $0.00 for numerous prisoners' medical bills even though their hospitalizations were extensive. Evidently, this fee structure incentivized Centurion to refrain from referring prisoners for off-site care unless and until there was a substantial certainty that the prisoners would require more extensive hospital stays.

55. The preceding cases, among others, also establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Chavez's injuries and thereby knew or should have known that additional safeguards should have been put in place to address patients' signs of serious medical and mental health conditions.

56. Accordingly, it can be inferred that Centurion intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety.

57. Centurion's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical and mental health conditions shares a close factual relationship with the events in Mr. Chavez's case, and accordingly, the widespread practice was the moving force behind his injuries.

58. Significantly, Centurion personnel failed to conduct diagnostic and physical examinations numerous times over the course of a year in Mr. Chavez's case alone, which establishes a pattern and practice of insufficient reporting, diagnoses, and treatment of serious

medical conditions.

59.     As such, Centurion's policy and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions proximately caused Mr. Chavez's injuries.

B.     Centurion had a pattern and practice of severely understaffing its medical and mental health facilities, which was a moving force behind Mr. Chavez's injuries.

60.     The fact of Centurion's chronic understaffing of medical positions during the time period leading up to Mr. Chavez's injuries is indisputable. It is widely known and documented. As emphasized in the October 23, 2018 New Mexico Legislative Finance Committee program evaluation of NMCD (the "Committee Report"): "Both state and contractor medical positions are frequently understaffed, threatening the quality of care provided. The Corrections Department's Office of the Medical Director, state employees who are responsible for overseeing the care, opportunities, and education necessary for patients to improve their health, including medical provider contract oversight, had a 25 percent vacancy rate as of October 2018." In particular, the Committee Report noted that "Centurion . . . struggled to recruit and retain staff, incurring fines of $1.1 million in each of the last two fiscal years for critical vacancies including dentists, licensed nurse practitioners, pharmacists, and medical directors."

61.     Centurion's pattern and practice of severe understaffing is a primary cause of the Constitutional violations concerning Mr. Chavez's medical treatment.

62.     Upon information and belief, Mr. Chavez was unable to receive adequate medical treatment due to the severe shortage of healthcare providers at MDC. Numerous important health protocols were violated, critical assessments and evaluations foregone, and reports missing in Mr. Chavez's file due to this severe staffing shortage, including the unfilled positions dedicated to

16

oversight of medical services contract compliance. It was this lack of medical care and contract oversight that exacerbated Mr. Chavez's medical issues and eventually caused his injuries.

63.     Simply put, Mr. Chavez received little to no healthcare services largely because there were very few healthcare providers working at MDC in the months leading up to his injuries.

64.     Through the Committee Report and its own records of vacancies, Centurion was put on notice that this severe understaffing was substantially certain to cause Constitutional violations regarding its patients' medical treatment, yet it chose to disregard that risk and, for years, continued to display a pattern and practice of severe shortages in medical staff and mental healthcare providers.

65.     In this way, Centurion acted with deliberate indifference to prisoners' healthcare needs. *See, e.g., Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (finding deliberate indifference to prisoners' healthcare needs where "gross deficiencies in staffing" and procedures cause the prisoner population to be "effectively denied access to adequate medical care").

C.     <u>Centurion also had a pattern and practice of failing to provide adequate medical documentation and failing to communicate changes in patient conditions, both of which contributed to Mr. Chavez's injuries.</u>

66.     Centurion failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Chavez. For example, in *Jerry Sisneros v. Centurion et al.*, No. D-101-CV-2019-00598 (N.M. 1st Dist. Ct.), Centurion failed to adequately record vitals, which contributed to the patient's delayed diagnoses and treatment for diskitis and osteomyelitis—the same conditions possessed by Mr. Chavez and at issue in the present case.

67.     Additionally, Centurion has a pattern and practice of misplacing or otherwise

failing to provide medical records for critical time periods leading up to the hospitalizations of its

patients. For example:

- In *Calvin Finch v. Centurion et al.*, No. D-101-CV-2019-00778 (N.M. 1st Dist. Ct.), Centurion failed to provide medical records for the critical month leading up to Mr. Finch's hospitalization.

- In *Norman DeHerrera v. Centurion et al.*, No. D-101-CV-2020-02549 (N.M. 1st Dist. Ct.), Centurion failed to provide medical records for the 76 days immediately preceding Mr. DeHerrera's toe amputation.

Likewise, in Plaintiff's case, Centurion failed to provide medical records for multiple critical time

periods preceding Mr. Chavez's hospitalizations and diagnoses.

68.    Notably, the Committee Report referenced an audit of Centurion released in June

2018 that put Centurion on notice that its charts fell short of industry best practices, and some

charts were "illegible or inaccurate, not filled out and submitted timely, and not used consistently."

The Committee Report also emphasized that documentation of certain test results was missing,

and intake forms were not completed for all prisoners as required.

69.    The preceding cases and report, among others, establish that Centurion was on

notice of these widespread unconstitutional practices prior to Mr. Chavez's injuries and thereby

knew or should have known that additional safeguards should have been put in place to address

the inadequate medical documentation and communication of changes in patient conditions.

70.    Accordingly, it can be inferred that Centurion intentionally failed to adequately

document patient conditions and failed to adequately communicate changes in those conditions

despite the known and obvious risk to patient safety.

71.    Centurion's widespread practice of failing to provide adequate medical

documentation and communicate changes in patient conditions shares a close factual relationship

18

with the events in Mr. Chavez's case, and accordingly, the widespread practice was the moving force behind his injuries.

72.    Notably, Mr. Chavez's case alone reveals sufficient evidence of Centurion's widespread practice of providing inadequate medical documentation and communication about patient conditions. For example, in the months leading up to Mr. Chavez's hospital visits, medical staff failed to perform sufficient medical examinations and accompanying documentation multiple times, in addition to providing no medical records for the weeks preceding his hospital visit from April 14, 2020 to May 7, 2020 and no medication administration records from February 1, 2020 to February 13, 2020—records which UNMH staff indicated were critical due to Mr. Chavez's incomplete course of antibiotics during this time when he was in Centurion's care and Bernalillo County's custody. Moreover, records for Mr. Chavez's January 2020 Augmentin prescription and February 28, 2020 Erythrocyte Sedimentation Rate report were both missing.

73.    Because Centurion personnel did not adequately document or otherwise communicate Mr. Chavez's rapidly deteriorating medical condition to the appropriate personnel, he was not provided with the medical treatment that he clearly needed, which caused him to sustain his injuries.

74.    Accordingly, Centurion's policy and practice of providing inadequate medical documentation and failing to communicate changes in patient conditions to appropriate personnel proximately caused Mr. Chavez's injuries.

D.    <u>Centurion failed to adequately train or supervise its individuals despite knowing that such training and discipline was necessary to protect patient health, and this failure was a moving force behind Mr. Chavez's injuries.</u>

75.    As outlined in the Committee Report, in 2018, the New Mexico Medical Review

19

Association conducted an audit of Centurion's medical services in prisons and recommended that staff be better educated by both Centurion and NMCD on chart documentation standards and consistency and in completing prisoner intake forms correctly. According to Centurion's auditors, the need for additional training and supervision was apparent and should have been prioritized.

76.    Similarly, the extensive violations of proper protocol in Mr. Chavez's case provide compelling evidence that Centurion had a widespread pattern and practice of failing to adequately train and supervise its personnel. As discussed in more detail above, Centurion medical staff failed to conduct necessary diagnostic and physical examinations in numerous instances over the course of 1-2 years as Mr. Chavez's medical condition worsened.

77.    As such, Centurion's widespread failures to train and supervise its personnel were a primary cause of the Constitutional violations suffered by Mr. Chavez. Each of Centurion's failures to conduct necessary examinations deprived Mr. Chavez of the opportunity to be evaluated, diagnosed, and to be prioritized in receiving the medical treatment that he so desperately needed. Because medical personnel were not adequately trained or supervised to ensure that the proper medical procedures were followed, Mr. Chavez never received the opportunity to obtain additional medical services until his medical condition had become severe. Consequently, he sustained the injuries that resulted in his multiple hospital visits.

78.    Training and supervision regarding proper medical treatment protocol and documentation was required because, as Centurion knew or should have known to a moral certainty, Centurion's personnel would commonly confront situations where they would need to assess the severity and emergency nature of patients' medical conditions. This is the one of the primary tasks that these personnel were hired to do.

79. Additionally, documenting and assessing the next steps in a patient's medical treatment is precisely the type of complex and important decision that requires training and supervision, as making the wrong choice in these instances will frequently cause the deprivation of prisoners' constitutional rights.

80. As evinced by Mr. Chavez's situation and the others cited in Subsection A of this section, Centurion's widespread pattern of deficient training and supervision presents an obvious potential to violate patients' Constitutional rights, because there has been a growing history where prisoners are denied serious medical care to which they are entitled, and they suffer from long-term disability or death as a result.

81. Centurion was alerted to an obvious deficiency in its training and supervision through the many prior lawsuits against it alleging unconstitutional medical care. It was also put on notice of these deficiencies through the 2018 audit results requiring that it provide better training and oversight of its personnel.

82. Centurion's failure to do so is further evidence of its deliberate indifference to the Constitutional violations caused by its widespread deficiencies in training and supervising.

**III. THE INDIVIDUAL DEFENDANTS HAD OVERSIGHT AUTHORITY OF CENTURION'S MEDICAL SERVICES AT MDC BUT ACTED WITH DELIBERATE INDIFFERENCE IN FAILING TO PERFORM ANY OVERSIGHT, THUS ALLOWING CENTURION'S UNCONSTITUTIONAL PATTERNS AND PRACTICES TO CONTINUE AND CAUSING MR. CHAVEZ'S INJURIES.**

83. Upon information and belief, each of the individual Defendants—Steven Wheeler, Rock Welch, Jeffrey Keller, Angela Goehring, Karen Riley, and Johnnie Lambert—knew that there were a high number of osteomyelitis cases at MDC and New Mexico jails and prisons in general and did nothing to protect prisoners from worsening osteomyelitis, including Mr. Chavez.

21

84. Upon information and belief, each of the individual Defendants also knew of Mr. Chavez's persistent expressions of worsening pain, his debilitated physical appearance, and his eventual inability to walk. Likewise, each of the individual Defendants knew that these symptoms posed a substantial risk of harm to Mr. Chavez, yet they did nothing to attempt to ameliorate that impending substantial harm, despite each having the authority and obligation to act to ameliorate that harm.

85. These individual Defendants became aware of the above information through prior internal and legislative reports, news coverage, weekly and quarterly meetings/calls amongst each other and with other Centurion medical staff, quarterly tracking documents, quality assurance program reports, monthly continuous quality improvement meetings, statistical reports submitted to the Health Services Bureau, training materials, continuous quality improvement audits, American Correctional Association audits, National Commission on Correctional Healthcare audits, performance improvement reports, corrective action plans, prisoner grievances, health services request forms, and individual inmate files, including Mr. Chavez's file—a sampling of which is cited in Section II of this Complaint, *supra*.

86. Any of the individual Defendants could have interceded on behalf of Centurion and/or MDC if any independent medical contractor did not appropriately care for any MDC prisoner. Yet, none of the individual Defendants interceded to protect Mr. Chavez from the deliberate indifference of Centurion medical staff.

87. Each of the individual Defendants had direct supervisory authority over the Centurion medical staff referenced above. Each of the individual Defendants failed to exercise any of their supervisory powers to end the inadequate training of identifying emergent infections and

thereby maintained a policy or custom of inadequate medical care by relying on insufficiently trained medical staff who inadequately refer prisoners for outside care.

88.    Although their supervisory roles empowered them to do so, none of the individual Defendants provided training to correctional staff or medical staff on the symptoms of osteomyelitis. None of the individual Defendants established reporting requirements for staff when deadly infections such as osteomyelitis are apparent. And none of the individual Defendants took any step to revise the policies or practices by which inadequately trained medical staff were responsible for diagnosing prisoners and acted as gatekeepers, effectively causing MDC prisoners to be denied all medical care for osteomyelitis and similar infections such as endocarditis.

89.    The Centurion medical staff at MDC referenced above were clearly inadequately trained, and each of the individual Defendants were responsible for ensuring that these staff were adequately trained to prevent the type of injuries and constitutional violations suffered by Mr. Chavez. Specifically, each of the individual Defendants were responsible for ensuring that Centurion did not perpetuate a policy or practice where prisoners were forced to resort to describing their medical problems to staff who were unqualified to diagnose illnesses like osteomyelitis or to identify such conditions and make the appropriate referrals.

90.    The individual Defendants knowingly endorsed and perpetuated a policy where prisoners at MDC were unable to make their medical problems known to staff, because the Centurion medical staff were not competent to diagnose illnesses to then refer prisoner patients to proper medical providers to treat those conditions. In this way, MDC prisoners were denied access to appropriately qualified health care personnel for serious, life-threatening conditions—and this knowing denial evinces the deliberate indifference of the individual Defendants.

23

91.     Consequently, each of the individual Defendants is liable according to claims of direct supervisory liability.

92.     The Centurian medical staff referenced above were each subordinates of the individual Defendants named in the Complaint, as these staff members were agents of Centurion, MHM, and Bernalillo County, and the individual Defendants each had supervisory authority over them. As such, the constitutional violations of Centurion medical staff properly serve as the basis for each of the Defendant's supervisory liability.

93.     Through their failures to act despite having the duty and authority to do so, each of the individual defendants personally implemented, utilized, and promulgated Centurion's unconstitutional practices and policies, as further outlined in Section II of this Complaint, *supra*.

94.     Overall, each of the individual Defendants maintained policies or customs of (a) failing to medically train prison employees responsible for diagnosing and treating prisoners, (b) delaying medical care, and (c) keeping poor records. As a result, Mr. Chavez's infection was allowed to become uncontrollable until he suffered from osteomyelitis, was restricted to a wheelchair, and needed emergency hospital intervention multiple times.

95.     The harm to Mr. Chavez could have been avoided if he had received a simple referral and had supervisory Defendants approved the referral to an outside specialist for proper diagnosis and treatment. Additionally, the harm to Mr. Chavez could have been avoided with proper reporting by Bernalillo County and Centurion personnel when it was clear that he was not receiving proper medical care and thus deteriorating rapidly

## IV.     DAMAGES SOUGHT

96.     As a direct result of Defendants' unlawful conduct, Mr. Chavez endured

24

tremendous pain, injuries, anguish, and suffering, which entitles him to general and special compensatory damages.

97.    Further, Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, in addition to pre-judgment interest and costs as allowed by federal law.

98.    Plaintiff is also entitled to punitive damages against each of the Defendants, as their actions were done with malice or, minimally, with reckless indifference to Mr. Chavez's federally protected rights.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
**8th and 14th Amendments to the U.S. Constitution**
**Deliberate Indifference to Serious Medical Need (42 U.S.C. § 1983)**
**(against Centurion, MHM, Bernalillo County, Steven Wheeler, Rock Welch, Jeffrey Keller, Angela Goehring, Karen Riley, and Johnnie Lambert in their individual capacities)**

99.    Each paragraph of this Complaint is incorporated as if fully restated herein.

100.    The abovenamed Defendants each possessed responsibility for the decisions that resulted in the violation of Mr. Chavez's constitutional right to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in Bernalillo County's custody, as described more fully above.

101.    These Defendants were aware of and deliberately disregarded the substantial risk of harm to Mr. Chavez that would ensue because of their failures to provide him with constitutionally adequate medical care, as described more fully above.

102.    Notably, each of the abovenamed Defendants was aware of Mr. Chavez's severe and escalating pain, yet took essentially no action to address this anguish, which constitutes deliberate indifference to his pain and deteriorating medical condition.

25

103.    The deliberate indifference of the abovenamed Defendants caused Mr. Chavez to experience worsening severe, prolonged and unnecessary pain (first harm), to develop osteomyelitis (second harm), and to suffer from a delayed diagnosis of osteomyelitis (third harm), which ultimately caused him to require multiple hospital visits and restricted him to a wheelchair.

104.    Mr. Chavez's harms were sufficiently serious injuries that a reasonable doctor or patient would find them important and worthy of immediate treatment. Without treatment, Mr. Chavez's worsening severe pain caused him to lose the ability to take care of his most basic needs and restricted him to a wheelchair at times. Without emergency hospital visits, Mr. Chavez's severe osteomyelitis would have caused him to die.

105.    Moreover, Mr. Chavez's severe pain and osteomyelitis significantly affected his daily activities, as he lost the ability to care for even his most basic needs and struggled through pain while completing basic tasks like standing up, walking, and lying down.

106.    The abovenamed Defendants are not shielded by qualified immunity for their deliberate indifference to Mr. Chavez's serious medical needs because of the well-documented 10th Circuit precedent notifying medical and prison personnel that the Eighth Amendment is violated when such personnel fail to take reasonable measures to provide a patient with access to medical attention and/or deny medical care to a patient with serious medical needs, as occurred in Mr. Chavez's case with each of the Defendants named herein.

**SECOND CLAIM FOR RELIEF:**
**8th and 14th Amendments to the U.S. Constitution**
**Policy & Practice of Denial of Medical Care (42 U.S.C. § 1983)**
**(against Centurion, MHM, and Bernalillo County)**

107.    Each paragraph of this Complaint is incorporated as if fully restated herein.

108. As a private corporation acting pursuant to its agreement with Bernalillo County to provide medical services to MDC prisoners, Centurion and MHM were at all times relevant to the events described in this Complaint acting under color of law and, as the providers of healthcare services to prisoners incarcerated at MDC, were responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by employees and agents of Centurion and MHM.

109. Mr. Chavez's injuries were proximately caused by Centurion's, MHM's, and Bernalillo County's unconstitutional policies and practices.

110. As further described above, Centurion, MHM, and Bernalillo County maintained a policy, practice, and custom of under-reporting the severity of medical and mental health emergencies and denying appropriate medical and mental health care to prisoners. On information and belief, Centurion medical staff working at MDC lack the necessary medical backgrounds to provide adequate care and are trained to ignore or under-report symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Chavez.

111. On information and belief, Centurion, MHM, and Bernalillo County supervise their employees and agents to ignore or under-report symptoms of medical and mental health emergencies, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Chavez.

112. On information and belief, Centurion, MHM, and Bernalillo County ratify the conduct of their employees and agents who ignore or under-report symptoms of medical and mental health emergencies through review and approval of these employees' and agents'

performance, and through the decision to continue the employment and contracting of such individuals and entities who ignore and under-report medical and mental health emergencies of MDC prisoners, which amounts to deliberate indifference to the serious medical needs of prisoners presenting symptoms of such emergencies, including Mr. Chavez.

113.    At all times relevant to this Complaint, Centurion, MHM, and Bernalillo County had notice of a widespread practice by their employees and agents at MDC and other New Mexico carceral facilities under which prisoners with serious medical conditions, including Mr. Chavez, were routinely denied access to proper or sufficient medication and medical attention. Upon information and belief, it was common to observe prisoners of MDC and NMCD prisons with clear symptoms of serious medical and/or mental concerns whose requests for medical care were routinely denied or completely ignored. Upon information and belief, a significant portion of these denials of medical and mental health care resulted in substantial injury or death.

114.    More specifically, there was a widespread practice under which employees and agents of Centurion, MHM, and Bernalillo County, including correctional officers and medical personnel, failed or refused to: (1) report, diagnose, and properly examine, monitor, and treat prisoners with serious medical and/or mental health conditions, including failing to provide proper medications to prisoners with serious medical and/or mental health conditions; (2) respond to prisoners who requested medical and/or mental health services; (3) respond to prisoners who exhibited clear signs of medical and/or mental health need or illness; (4) adequately document and communicate the medical and mental health needs of prisoners to the appropriate correctional officers and/or medical or mental health staff; or (5) timely refer prisoners for emergency or other offsite medical services.

28

115. Additionally, there was a widespread practice under which Centurion severely understaffed its medical and mental health facilities and failed adequately to train and supervise its personnel on necessary medical and mental health procedures.

116. These widespread practices were allowed to proliferate because Centurion, MHM, and Bernalillo County directly encouraged, and were the moving forces behind, the specific misconduct at issue. Centurion, MHM, and Bernalillo County also failed to adequately hire, retain, train, supervise, and control correctional officers and medical personnel by failing to adequately punish and discipline prior instances of similar misconduct, thereby directly encouraging future abuses like those which harmed Mr. Chavez.

117. Centurion, MHM, and Bernalillo County knew of the substantial risk of serious or fatal consequences that could be caused by their unconstitutional policies, practices, customs, failures to train, and failures to supervise, hire, and retain appropriately credentialed staff, as occurred in Mr. Chavez's case. However, they intentionally continued to perpetuate these unconstitutional policies and practices despite the known risks.

118. These policies and conduct were the moving force behind the violations of Mr. Chavez's constitutional rights and his injuries. Mr. Chavez's injuries were caused by employees and contractors of Centurion, MHM, and Bernalillo County, including but not limited to the individually-named Defendants, who acted pursuant to the unconstitutional policies and practices of Centurion, MHM, and Bernalillo County while engaging in the misconduct described in this Complaint.

119. Upon information and belief, Centurion and MHM maintained these policies and practices in order to maximize profit and without regard to its constitutional and medical

29

obligations to MDC prisoners who were entrusted to Centurion's and MHM's care.

120.    Centurion, MHM, and the Centurion/MHM individual Defendants are not shielded by qualified immunity for their unconstitutional policies and practices, because private companies and their private employees are never entitled to qualified immunity, even when employed doing correctional work. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief against Defendants, jointly and severally:

(a)    Monetary damages against Centurion and individual Defendants sued under 42 U.S.C. § 1983 in their individual capacities in an amount to be determined at trial to compensate Plaintiff for the injuries he sustained as a result of the events and conduct alleged herein;

(b)    Punitive damages against all Defendants in an amount to be determined at trial;

(c)    Statutory interest on any and all damages awarded to Plaintiff;

(d)    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(e)    Such other and further relief as the Court may deem just and proper, including injunctive and declaratory relief.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues in this case so triable.

Dated: May 6, 2024

Respectfully submitted,

/s/ Parrish Collins
COLLINS & COLLINS, P.C.
Parrish Collins
P.O. Box 506
Albuquerque, NM 87103
(505) 242-5958
parrish@collinsattorneys.com

-and-

GUEBERT GENTILE PIAZZA & JUNKER P.C.
Elizabeth M. Piazza
P.O. Box 93880
Albuquerque, NM 87199
(505) 823-2300
epiazza@guebertlaw.com

-and-

PRISON LIGHTS, INC.
Elise C. Funke
407 Seventh Street NW
Albuquerque, NM  87102
(505) 600-2392
elise@prisonlights.org

*Attorneys for Plaintiff*

31